STEPHANIE HARDY, Employee, Plaintiff,
v.
MASTERBRAND CABINETS, INC., I.C., Employer, GALLAGHER BASSETT, Carrier, Defendants.
No. COA07-1195
Court of Appeals of North Carolina
Filed July 1, 2008
This case not for publication
Harrington, Saunders & Jones, P.A., by David A. Jones, for plaintiff-appellant.
Baker & Daniels, L.L.P., by Kelley Bertoux Creveling; Womble, Carlyle, Sandridge & Rice, by Philip J. Mohr, for defendant-appellees.
HUNTER, Judge.
Stephanie Hardy ("plaintiff") appeals from an Industrial Commission order denying her workers' compensation benefits. After careful review, we affirm.

I.

A.
In March 2000, plaintiff began working for defendant, and in July 2000, she was promoted to the position of shipping supervisor. During her employment, plaintiff began having episodes of coughing and wheezing; she was diagnosed every two to six months with bronchitis. From 30 October 2001 through 4 August 2003, plaintiff was treated by a general physician and by Dr. Robert T. Gallaher for her pneumonia-like symptoms.
In early August 2003, plaintiff was admitted to the hospital to have a mass about the size of a tennis ball removed from her left lung. She was diagnosed with bronchial obliterans organizing pneumonia ("BOOP") and was ultimately sent to Dr. Cynthia Brown for treatment. Plaintiff resigned from her position with defendant in March 2003.
Plaintiff filed a claim on 6 January 2004 for worker's compensation benefits pursuant to N.C. Gen. Stat. § 97-53(13) (2007). N.C. Gen. Stat. § 97-53 enumerates the only types of "diseases and conditions" to be considered occupational diseases under the Workers' Compensation Act; N.C. Gen. Stat. § 97-53(13) deals with the occupational diseases that are not specifically listed in that section. This specific provision states that "[a]ny disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment" will be considered an occupational disease. N.C. Gen. Stat. § 97-53(13).
On 30 June 2006, a deputy commissioner from the Industrial Commission issued an opinion and award holding that plaintiff had suffered a compensable occupational disease and granted benefits under the Workers' Compensation Act. Defendants appealed to the Full Commission, which subsequently reversed the decision of the deputy commissioner in an opinion and award filed 25 April 2007. Plaintiff appeals.

B.
For clarity's sake, we first identify the various doctors referred to by the parties that, at some point, treated plaintiff, as well as a brief summary of their involvement:
1 * Dr. Gallaher, a pulmonologist, began treating plaintiff in December 2002, at which time he diagnosed her with pneumonia and gastroesophageal reflux disease. Dr. Gallaher continued to treat plaintiff through July 2003, during which time he ordered a CT scan of her lungs (in June 2003) that showed no BOOP in her lungs. Dr. Gallaher stated that this demonstrates the BOOP did not exist at that time, three months after plaintiff ceased working for defendant.
2 * Dr. Rupert Jilcott was plaintiff's family physician. He treated her from October 2001 through August 2003, during which time she was admitted to the hospital for pneumonitis (inflammation of lung tissue; pneumonia is a type of pneumonitis). The Industrial Commission order states that "Dr. Jilcott indicated and plaintiff acknowledged" that plaintiff's pneumonia in December 2002 was not work related. Dr. Jilcott ended his treatment before the diagnosis of lipoid pneumonia was made and was not deposed for this suit.
3 * The Mayo Clinic's only role in plaintiff's treatment was an examination of a biopsy of plaintiff's lung taken in August 2003; their report stated that plaintiff suffered from endogenous lipoid pneumonia, meaning that the lipids causing her pneumonia originated from within her body rather than from an external source.
4 * Dr. Brown was plaintiff's treating physician from September 2004 forward. She diagnosed plaintiff with exogenous (originating outside the body) lipoid pneumonia, in contrast to the Mayo Clinic's finding. Dr. Brown treated plaintiff for lipoid pneumonia and BOOP; plaintiff was still in her care when this suit was brought.

II.
Our review of the Industrial Commission's decisions is "strictly limited to the two-fold inquiry of (1) whether there is competent evidence to support the Commission's findings of fact; and (2) whether these findings of fact justify the Commission's conclusions of law." Foster v. Carolina Marble and Tile Co., 132 N.C. App. 505, 507, 513 S.E.2d 75, 77 (1999). Upon such review, "[t]he Commission's findings will not be disturbed on appeal if they are supported by competent evidence even if there is contrary evidence in the record. However, the Commission's conclusions of law are reviewable de novo by this Court." Hawley v. Wayne Dale Constr., 146 N.C. App. 423, 427, 552 S.E.2d 269, 272 (2001) (citations omitted).

III.
Plaintiff makes three arguments to this Court that, at their most basic, are three versions of the same argument: That the Industrial Commission either ignored or did not take as true the testimony of Dr. Brown, plaintiff's medical expert.
Plaintiff first argues that the Industrial Commission improperly substituted its own opinion for that of the medical experts in coming to its conclusions. Specifically, she argues the Commission's order indicates that it relied on improper evidence and ignored uncontroverted competent evidence.
Plaintiff's second argument is, in essence, that the Industrial Commission did not listen to and agree with Dr. Brown's opinion as to the causation of plaintiff's illnesses. Her final argument is a general statement that the Industrial Commission ignored plaintiff's evidence. We consider these in turn.
Plaintiff first argues that finding of fact number 29 and conclusion of law number 1 show plainly that the Industrial Commission applied the law incorrectly. Finding of fact number 29 reads: "The undersigned give greater weight to medical evidence provided by Dr. Gallaher, Dr. Jillcott[1], and the Mayo Clinic." Conclusion of law number 1 reads:
Plaintiff's condition is not characteristic of persons engaged in her particular trade or occupation and is not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade. Plaintiff has failed to establish a causal connection between her condition and her employment with defendant.
Plaintiff argues that the wording of this statement suggests that the Industrial Commission ignored the testimony of Dr. Brown and, because "none of these doctors provide expert medical opinions regarding Plaintiff's conditions" (as opposed, plaintiff argues, to Dr. Brown), the Commission must have substituted its own judgment for that of the experts, which is a misapplication of the law. The finding of fact does seem to imply that the Commission gave more weight to this evidence than to that of Dr. Brown, her primary doctor since the diagnosis of lipoid pneumonia. However, twelve findings of fact address Dr. Brown's evidence:
19. On September 23, 2004, plaintiff began treating with Dr. Brown, who is board certified in internal medicine. Dr. Brown diagnosed plaintiff with BOOP secondary to lipoid pneumonia. Dr. Brown testified that plaintiff's disease is extremely rare, and there have been approximately ten cases reported worldwide since 1955.
20. Dr. Brown indicated through deposition testimony that there are two types of lipoid pneumonia: exogenous lipoid pneumonia and endogenous lipoid pneumonia. Endogenous means that the lipid was created within the body. Exogenous means the lipid entered into the body from outside. Dr. Brown diagnosed plaintiff with exogenous lipoid pneumonia, meaning the lipid came from outside of her body.
21. Although Dr. Brown had not identified the specific lipid causing the pneumonia, she suspected that plaintiff was exposed to aerosolized lipids from furniture polish that would have been sprayed on furniture and aerosolized in the air. However, Dr. Brown erroneously believed that plaintiff was involved in the finishing, varnishing[,] or polishing of furniture. Dr. Brown never visited the facility where plaintiff worked. Dr. Brown was not aware that plaintiff was a supervisor in the shipping department and that plaintiff's job as a shipping supervisor did not involve furniture finishing or spraying furniture polish. Plaintiff was never employed by defendant in the finishing department. Dr. Brown was not aware that plaintiff was not a sprayer and that plaintiff had a separately enclosed, climate controlled office. Additionally, Dr. Brown was not acquainted with the setup or ventilation in the shipping department.
22. Dr. Brown never identified any specific substance or lipid causing the lipoid pneumonia in plaintiff's workplace with defendant that was the cause of plaintiff's problems. Plaintiff never identified for Dr. Brown any of the items in the MSD sheets that she worked with. Dr. Brown reviewed the MSD sheets provided by defendant at plaintiff's request but was unable to understand or interpret the MSD sheets. Dr. Brown has no information as to which particular chemicals plaintiff may have been exposed to at defendant's facility or at what level of exposure. Dr. Brown did not conduct or request any pathology tests on tissue samples from plaintiff to test for any of the chemicals shown in the MSD sheets.
23. Dr. Brown testified that plaintiff's condition had to be caused by an oil mist with a particle size of 2.5 micrometers or less in order for the particles to get far down into plaintiff's lungs. Dr. Brown had no information indicating that the required size particle was present at defendant's facility.
24. Although Dr. Brown did not have knowledge of the air quality in defendant's facility, the air quality monitoring in defendant's finishing department at the time of plaintiff's resignation showed air quality levels well within OSHA standards. Dr. Brown had no information with respect to quantities of chemicals in the air or what level of exposure plaintiff may have experienced to any chemicals at defendant's facility. Similarly, Dr. Brown did not ask plaintiff about chemicals and oils in use at her home or in her everyday life.
25. Dr Brown indicated that there are other potential causes of plaintiff's BOOP and lipoid pneumonia. According to Dr. Brown, it is possible that the oil or lipid causing plaintiff's BOOP secondary to lipoid pneumonia could have come from a paint exposure at Lowes. Dr. Brown never asked for the MSD sheets pertaining to plaintiff's employment at Lowes. It is also possible that plaintiff was exposed to lipids causing her condition through cigarette smoke. Plaintiff also hasmoderate obstructive lung disease based at least in part on her smoking.
26. In formulating an opinion, Dr. Brown did not review the records from plaintiff's long-term family physician, Dr. Jilcott[,] or from her pulmonologist, Dr. Gallaher. Dr. Brown was not aware that plaintiff had suffered from pneumonia before working for defendant.
27. Dr. Brown indicated in his deposition testimony that plaintiff's lipoid pneumonia was cured and that plaintiff had not had a recurrence of the BOOP since December 2004. According to Dr. Brown, plaintiff is still not able to work eight straight hours because she gets worn out but does not know why.
28. The undersigned find that there is insufficient evidence to prove that BOOP secondary to lipoid pneumonia is characteristic of those employed in the cabinet or furniture manufacturing industry as plaintiff was.
29. The undersigned give greater weight to medical evidence provided by Dr. Gallaher, Dr. Jillcott, and the Mayo Clinic.
30. Although Dr. Brown testified that plaintiff's BOOP and lipoid pneumonia were caused by plaintiff's exposure to chemicals while at work, the greater weight of the medical evidence shows there is not a causal connection between plaintiff's conditions and plaintiff's work for defendant.
Clearly, then, the Commission did not ignore Dr. Brown's evidence; it considered Dr. Brown's testimony, as well as what information she did and did not have about plaintiff's medical history, work history, and working conditions while employed by defendant.
Further, the medical evidence to which finding of fact number 29 refers  the evidence to which the Commission lent weight  was that furnished by Dr. Gallaher, a pulmonologist who saw no indication of the disease complained of in June 2003, three months after plaintiff left defendant's employ; by Dr. Jilcott, plaintiff's family doctor to whom she acknowledged that her pneumonia in December 2002  while she was still in the employ of defendant  was not work related; and by the Mayo Clinic, whose diagnosis stated that the substance that caused plaintiff's lipoid pneumonia and therefore BOOP originated from inside her body. Plaintiff argues that because these sources did not provide medical opinions, but merely medical evidence, the Commission's reliance on them meant it must have read the reports provided and drawn its own conclusions  that is, formed its own medical opinions  which plaintiff argues is forbidden by our case law.
In making her arguments, plaintiff relies heavily on Click v. Freight Carriers, 300 N.C. 164, 265 S.E.2d 389 (1980). There, however, the Industrial Commission awarded benefits to the employee for a complex spinal injury without taking any medical testimony to establish causation between the incident that occurred in the workplace and the injury. Id. at 167, 265 S.E.2d at 391. Thus, the Court's conclusion that "[r]eliance on Commission expertise is not justified where the subject matter involves a complicated medical question" referred not to the Commission ignoring competent medical evidence, but to the failure to present any medical evidence to the Commission. Id. at 168, 265 S.E.2d at 391.
A much more instructive opinion is by this Court, citing to the general principles of Click, in Baker v. City of Sanford, 120 N.C. App. 783, 787, 463 S.E.2d 559, 562 (1995), which summarized the guidelines for the Industrial Commission in cases such as the one at hand:
In determining complex causation in workers' compensation cases, "the Commission may, of course, consider medical testimony, but its consideration is not limited to such testimony." The Commission "is not limited to the consideration of expert medical testimony in cases involving complex medical issues," and the Commission need not "find in accordance with plaintiff's expert medical testimony if the defendant does not offer expert medical testimony to the contrary."
However, the Commission must still base its findings of fact on competent evidence. It is settled that if there is any competent evidence to support the Commission's findings, this Court is "not at liberty to reweigh the evidence and to set aside the findings . . . simply because other . . . conclusions might have been reached." "This is so, notwithstanding the evidence upon the entire record might support a contrary finding."
Id. (citations omitted) (alterations in original). Thus, the accurate rule for the case at hand is that in considering complex medical issues, the Commission must, as always, base its findings of fact on competent evidence, but that evidence need not consist solely of the testimony of medical experts; further, even if plaintiff offers a medical expert whose testimony is uncontroverted, the Industrial Commission need not take it as true. Finally, as usual, this Court may not on appeal reweigh the evidence before the Industrial Commission and set aside its findings because the evidence might also support a different version of the facts. This rule in fact covers all of plaintiff's arguments: The Industrial Commission is the weigher of evidence; it must base its findings on competent evidence, including medical testimony; and the Industrial Commission need not believe one expert over another, or one expert even if uncontroverted.
The other case on which plaintiff heavily relies is Bostick v. Kinston-Neuse Corp., 145 N.C. App. 102, 549 S.E.2d 558 (2001), which she says stands for the principle that the Industrial Commission may not "give greater weight to [a] doctor's testimony where th[at] doctor did not give an opinion regarding causation[.]" In Bostick, the Industrial Commission mentioned two doctors' opinions in its order and stated that the opinions were in direct opposition on the point of causation for the type of injury incurred. Id. at 109, 549 S.E.2d at 562. This Court held that because the second doctor did not state an opinion as to the cause of the injury in this patient and specifically stated that he would defer to the first doctor on the issue of causation, the finding was not supported by competent evidence. Id. at 109-10, 549 S.E.2d at 562-63.
In the case at hand, the Industrial Commission did not attempt to put words in the mouth of any of the three medical experts to whose testimony it gave greater weight; it did not state that in their opinion causation was absent in this case, for example. Instead, the Industrial Commission's order reflects only that the Commission considered the evidence presented by those experts. Plaintiff's arguments to the contrary are without merit. Because plaintiff has not shown that the Full Commission's findings are not based on competent evidence, we affirm its opinion and award.
Affirmed.
Judges ELMORE and STROUD concur.
Report per Rule 30(e).
NOTES
[1] This finding of fact is the only place in the Industrial Commission's order where this name is spelled with two Ls. It appears that the correct spelling is "Jilcott."